1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

U.S.N.R. KOCKUMS CANCAR
COMPANY, a Canadian corporation,

               Plaintiff,

      v.

RAPTOR INTEGRATION
INCORPORATED, a Canadian
corporation; MACHINAGE PICHÉ, INC.,
a Canadian corporation; and TIMOTHY
MOSHER, a Canadian citizen,

               Defendants.

CASE NO. C11-5935 RBL

ORDER CONSTRUING CLAIMS

This matter comes before the Court pursuant to *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995), to construe the undisputed and disputed claim terms of United States Patent No. 5,911,302 ("the '302 Patent").  The Court has reviewed each party's opening and responsive brief, heard oral argument of counsel, and considered the remainder of the file and hereby construes the claim terms at issue as stated herein.

ORDER - 1

## I. PROCEDURAL HISTORY

On November 14, 2011, Plaintiff U.S.N.R. Kockums Cancar Company ("USNR")

filed a complaint against Defendants Raptor Integration Incorporated ("Raptor"),

Machinage Piché, Inc. ("Piché"), and Timothy Mosher ("Mosher") alleging, among other

claims, infringement of the '302 Patent.  Dkt. 1.  USNR asserted that the infringement

claim was based on an alleged offer to sell an infringing product.  *Id*. ¶ 37.

On August 17, 2012, USNR filed an amended complaint alleging patent

infringement based on an allegation of at least one actual sale of an infringing product

and an allegation of an offer to sell an infringing product.  Dkt. 33, ¶¶ 38–40.

On March 8, 2013, the parties filed opening claim construction briefs.  Dkts. 47,

49, & 50.  On March 22, 2013, Defendants responded (Dkts. 52 & 53) and UNSR

responded (Dkts. 54 & 55).  On March 25, 2013, the parties filed an amended joint claim

construction chart and prehearing statement.  Dkt. 56.

## II. PATENT

On June 15, 1999, the United States Patent and Trademark Office ("USPTO")

issued the '302 Patent titled "Circulating Paddle Board Positioning Apparatus."  '302

Patent at 1.  The patent provides that the "invention relates to the field of sawmill

machinery, and in particular to board positioning devices."  *Id*., col. 1, ll. 6–7.  The patent

also states that

> it is the object of the present invention to provide a board positioning
> device which can accurately position selected boards lengthwise, that is,
> transversely across the transfer deck and process the boards through the
> trimmer at a higher rate of speed than prior art devices and without
> substantial board slippage or bounce, or collapse of the board's weak ends,

1    to thus provide an improvement in maintaining a consistently accurate and
     optimally trimmed board.

2

     *Id.*, col. 1, ll. 53–61.

3

# III. DISCUSSION

4

## A.    Legal Standard

5

It is the obligation of the court to construe as a matter of law the meaning of

6

language used in a patent claim. *Markman*, 52 F.3d at 979.  In construing a patent's

7

claim terms, a court must consider the intrinsic evidence in the record. *See Phillips v.*

8

*AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005).  Intrinsic evidence includes the

9

ordinary and customary meaning of the claim terms, the specification of the patent, and

10

the patent's prosecution history. *Id.*

11

The ordinary and customary meaning of a term is defined by a person of ordinary

12

skill in the art at the time of the invention. *Id.*  The context in which a term is used can be

13

"highly instructive" in resolving the meaning of the term. *Id.* at 1314.  For example, if a

14

claim has the term "steel baffle," it strongly implies that the term "baffle" does not

15

inherently include objects made of steel. *Id.*  Other claims in a patent may also provide

16

valuable contextual cues for deciphering the meaning of a term. *Id.*  If a limitation is

17

present in a dependent claim, then there is a presumption that the limitation is not present

18

in the parent claim. *Id.* at 1314–15.

19

The claims must also be read in light of the specification. *See Markman*, 52 F.3d

20

at 979. The specification is always highly relevant to the meaning of a claim term:

21

"Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."

22

1  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  If the

2  specification reveals a definition of a claim term that is different from how that term

3  would otherwise be used, then "the inventor's lexicography governs."  *See Phillips*, 415

4  F.3d at 1316.  Courts should take care, however, not to import limitations from the

5  specification into the claims.  *Id*. at 1323.  For example, even if the specification

6  describes very specific embodiments, the claim terms should not be confined to those

7  embodiments.  *Id.*

8       The prosecution history of a patent is the last piece of intrinsic evidence that a

9  court should consider when construing the claims of the patent.  *Id*. at 1317.  The

10  prosecution history provides evidence of how the USPTO and the inventor understood

11  the patent.  *Id*.  A court, however, should be aware that the prosecution history represents

12  the ongoing negotiation between the USPTO and the applicant, rather than the final

13  product.  *Id*.  As such, the prosecution history may lack the clarity of the specification

14  and may not be as useful for claim construction purposes.  *Id*.  In certain instances,

15  however, the prosecution history may provide guidance of an applicant's intent to

16  specifically limit the scope of a given claim term.  *Id*.

17       Extrinsic evidence is the last category of evidence a court may consider when

18  construing patent claims.  *Id*.  Such extrinsic evidence includes expert and inventor

19  testimony, dictionaries, and learned treatises.  *Id*.  On its own, extrinsic evidence is

20  unlikely to be reliable in guiding the court's claim construction.  *Id*. at 1319.  Instead,

21  extrinsic evidence should be considered in the context of the intrinsic evidence.  *Id*.  A

22

1   court may also use extrinsic evidence to determine how a person of ordinary skill in the

2   art would understand the claimed invention.  *Id.*

3          Although it is the court's duty to resolve fundamental disputes among the parties

4   as to the scope of a claim term, it is not the court's duty to construe every claim term, or

5   to repeat or restate every claim term.  *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d

6   1554, 1568 (Fed. Cir. 1997); *02 Micro Int'l Ltd. v. Beyond Innovation Tech Corp.*, 521

7   F.3d 1351, 1362 (Fed. Cir. 2008).

8          Ultimately, the interpretation to be given a term can only be
        determined and confirmed with a full understanding of what the inventors
9          actually invented and intended to envelop with the claim. The construction
        that stays true to the claim language and most naturally aligns with the
10         patent's description of the invention will be, in the end, the correct
        construction.
11

    *Phillips*, 415 F. 3d at 1312 (citing *Renishaw PLC v. Marposs Societa' per Azioni*, 158
12
    F.3d 1243, 1250 (Fed. Cir. 1998).
13
           In the instant case, the parties agree that some claim elements should be construed
14
    as means- or step-plus-function terms.  35 U.S.C. § 112, paragraph 6 provides that:
15
           An element of a claim for a combination may be expressed as a
16         means or step for performing a specified function without the recital of
        structure, material, or acts in support thereof, and such claim shall be
17         construed to cover the corresponding structure, material, or acts described
        in the specification and equivalents thereof.
18
    A "means-plus-function" claim term provides "purely functional limitations that do not
19
    provide the structure that performs the recited function." *Phillips*, 415 F.3d at 1311.  A
20
    claim term is presumed to be means-plus-function when the word "means" appears in the
21
    claim element.  *Callicrate v. Wadsworth Mfg. Co.*, 427 F.3d 1361, 1368 (Fed. Cir. 2005).
22

1    The construction of a means-plus-function limitation requires two steps.  First, the

2    claimed function is determined.  *JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d

3    1324, 1330 (Fed. Cir. 2005).  Second, "the corresponding structure in the written

4    description that performs that function" is identified.  *Id.*  A court may not import

5    functional limitations that are not recited in the claim, or structural limitations from the

6    written description that are unnecessary to perform the claimed function.  *Micro Chem.,*

7    *Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).

8    With these standards and rules in mind, the Court turns to the undisputed and

9    disputed claim terms of the '302 Patent.

10   **B.    Undisputed Terms**

11   The parties agree on and the Court adopts the constructions of the following terms:

| "board ending means" | Construed under 35 USC §112, ¶6 as the ending rolls as shown in reference numeral 26 for urging lumber against board positioners 28, and in particular, against positioner paddles 40. |
|---|---|
| "coupling means" | Construed under 35 USC §112, ¶6 to be a channel portion of the selectively actuable guide member 30 that engages the guide member engaging means. |
| "translation speed" | The velocity at which a board travels in the first direction, measured by reference to a fixed point |

18   **C.    Disputed Terms**

19   The parties dispute nine terms in the '302 Patent, and USNR requests that the

20   Court correct one typographical error in another term.  As a threshold matter, USNR

21   argues that its request for the construction of certain terms "should not be construed as an

22   admission that such terms are required elements or limitations of the claimed invention."

1  Dkt. 50 at 8.  While USNR may reserve its position for a subsequent motion on the issue,

2  the Court will proceed on the theory that the terms of the claim are limitations because it

3  "is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to

4  which the patentee is entitled the right to exclude.'"  *Phillips*, 415 F.3d at 1312 (quoting

5  *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115

6  (Fed. Cir. 2004)).  With this is mind, the Court turns to the disputed terms.

7       **1.       "Board positioning member"**

8       The parties request that the Court construe the term "board positioning member."

9  Dkt. 56 at 3–4.  This element of the invention makes contact with the board and moves

10  with the board from the position of first contact to the optimized board position.  Raptor

11  proposes that the Court construe the term as a "generally telescoping device having a

12  sleeve receiving a shaft and a paddle which can cooperate with the selectively actuable

13  guide member in the plane of the board translating device."  Dkt. 56 at 4.  During oral

14  argument Raptor's counsel conceded that "telescoping" could be an incorrect limitation

15  and offered the construction of "a generally linearly extensible device having a sleeve

16  receiving a shaft and a paddle . . . ."  Piché agrees and requests that the Court adopt this

17  or a similar construction.  Dkt. 49 at 10.  The problem with these constructions, however,

18  is that they are based off the description of the preferred embodiment.  *See Phillips*, 415

19  F.3d at 1323 (even if the specification describes very specific embodiments, the claim

20  terms should not be confined to those embodiments).  Therefore, the Court declines to

21  adopt either of these constructions.

22

1    With regard to USNR's proposed construction, the Court finds that it incorporates

2  almost all of the disclosed limitations, but lacks one important limitation.  USNR

3  proposes that the Court construe the term as a "surface that is movably coupled to the

4  board positioning member translating means that can be selectively positioned in the

5  second direction[1] to place the board in an optimized board position."  Dkt. 56 at 4.  In

6  other words, USNR is describing a paddle or similar structure (surface) that is somehow

7  coupled to the means of moving the board from the position of first contact to the

8  optimized position.  Raptor contends, and Piché agrees, that such a construction ignores

9  the requirement that the board positioning member must interact with the selectively

10  actuable guide member.  Dkt. 52 at 7–8.  The Court agrees.  In the summary of the

11  invention, the specification provides that the "board positioning member has a guide

12  member engaging means for slideably coupling, by coupling means, the board

13  positioning member to the selectively actuable guide member."  '302 Patent, col. 3, ll.

14  25–28.  The preferred embodiment discloses that "Positioner guide rollers (or pins) 36 are

15  mounted to and protrude from positioner shafts 38 so as to slidingly engage guides 30."

16  *Id.*, col. 4, ll. 50–53.  Therefore, the Court declines to adopt USNR's proposed

17  construction because it does not include the important cooperating limitation.

18    With regard to this missing limitation, Raptor provides an acceptable construction.

19  Raptor proposed a shaft and a paddle that "can cooperate with the selectively actuable

20  _____

21    [1] The patent references a first direction and a second direction.  The first direction is the
direction of movement toward the board trimmers whereas the second direction is a direction
perpendicular to the board trimmers that places a particular board in an optimized position to be
22  trimmed.

1   guide member in the plane of the board translating device." Dkt. 56 at 4.  Adding this

2   limitation to USNR's construction, the Court construes the term "board positioning

3   member" as

4       a surface that is movably coupled to the board positioning member
        translating means and cooperates with the selectively actuable guide
5       member in the board positioning direction so that the board may be
        selectively positioned in an optimized board position.

6
        ## 2.        "Optimization means"

7
        The parties request that the Court construe the term "optimization means", and

8   they agree that the term should be construed as a means-plus-function term.  Dkt. 56 at 5.

9   The Court agrees and must first determine the claimed function.  *JVW Enters.*, 424 F.3d

10  at 1330.  The claim language describes a device to "selectively position said board in said

11  second direction at an optimized board position predetermined by optimization means

12  cooperating with said selectively actuable guide member."  '302 Patent, col. 6, ll. 53–56.

13  USNR contends that the claimed function is to "predetermine the optimized board

14  position of a board."  Dkt. 54 at 11.  Although Raptor and Piché provide somewhat

15  different functions, they "appear to agree" on the claimed function and the real dispute

16  lies in determining the corresponding structure.  Dkt. 52 at 8.  Therefore, the Court finds

17  that the claimed function of the "optimization means" is to "predetermine the optimized

18  board position of a board."

19      The second step of construction requires the Court to identify the corresponding

20  structure for performing that function.  *JVW Enters.*, 424 F.3d at 1330.  The specification

21  describes a "board optimizer" in the summary of the invention and an "optimizer" in the

22

1  detailed description of the preferred embodiment.  First, the "board optimizer" is "an

2  optical scanner and its cooperatively associated optimization information processor and

3  controller, scanning and providing optimization and control information to the board

4  positioning device in relation to an optimized trimming solution for the board."  '302

5  Patent, col. 4, ll. 7–11.  Second, the detailed description discloses

6          An electro-optical scanner (not shown) scans boards 24 and provides
          shape and flow information to an optimizer such as a programmed
7          computer. The optimizer shown diagrammatically in FIG. 3, sends signals
          to a computer logic controller for the corresponding board 24. The logic
8          controller activates and selectively actuates bi-directional positioning
          cylinders 32 as board 24 is translated on transfer chain 14.

9  *Id.*, col. 5, ll. 10–17.

10     Raptor and Piché argue that the Court should determine that the required structure

11  is the structure that is disclosed in the summary of the invention.  Dkt. 56 at 5.  That

12  disclosure, however, is preceded by the qualifying language "[i]n a further aspect [of the

13  present invention]" and "board optimizer" is immediately followed by the term "such as",

14  which is commonly understood as providing a specific example of the preceding element.

15  Therefore, the Court declines to construe the term as this specific structure and must

16  determine whether the preferred embodiment discloses a different corresponding

17  structure for performing the identified function.[2]

18     The inventor disclosed that, in the preferred embodiment, the optimizer was a

19  programmed computer that receives "shape and flow information."  '302 Patent, col. 5, ll.

20  _____

21     [2] It is worth noting that neither Raptor nor Piché argue that the patent is invalid for
   indefiniteness because they concede that the patent discloses at least one structure for performing
22  the identified function.

1  10–17.  USNR contends that the programmed computer is a structure that performs the

2  identified function.  Dkt. 56 at 6.  Raptor and Piché disagree with this contention.  Dkts.

3  52 at 8–9 & 53 at 8–9.  During oral argument, Piché's counsel argued that such a

4  construction would result in a "brain with no eyes."  However, sticking with this analogy,

5  the brain can receive input from four other senses and operate properly.  As the Court

6  understands the invention and as USNR's expert testified, how the optimizer receives

7  input is not important.  What is important is that the optimizer predetermines the correct

8  cutting position of the board based on the information that it does receive.  Therefore, the

9  Court adopts USNR's proposed construction with an added "receiving" limitation and

10  construes the term "optimization means" as

11  > either a programmed computer that receives shape and flow information or
>     an optical scanner and its cooperatively associated optimization information
12  > processor and controller for calculating the optimized board position.

13  **3.      "Board translating device"**

14  Raptor and USNR request that the Court construe the term "board translating

15  device."  Dkt. 56 at 3.  In the preferred embodiment, this device transports the boards in

16  the first direction.  Raptor proposes that the Court construe the term as a "generally

17  horizontal table having transfer chains or belts for transferring lumber in the plane of the

18  table."  Dkt. 56 at 3.  USNR contends that, because this is not a mean-plus-function term,

19  it would be improper to incorporate the specific means of transport (the chains or belts)

20  into the claim.  Dkt. 54 at 12–13.  The Court agrees.  Although chains and belts are

21  disclosed in the specification, the claim language is broadly written and it would be err to

22

1  limit this element to those specific disclosures. *Phillips*, 415 F.3d at 1323. Therefore, the

2  Court declines to adopt Raptor's proposed construction.

3      USNR proposes that the Court construe the term as a "support frame for

4  transferring a board in a first direction." Dkt. 56 at 3. The phrase "a support frame" is

5  overly broad and is not disclosed in any part of the patent. In the summary of the

6  invention, the patentee discloses a "transfer table" that "translate[s] the boards to

7  positioners and through a trimmer." '302 Patent, col. 1, ll. 65–67. Therefore,

8  incorporating the actual disclosure, the Court construes the term "board translating

9  device" as

10      a transfer table for transferring a board in the first direction.

11      **4.      "Board positioning member translating means"**

12      Both USNR and Piché agree that the Court should construe the term "board

13  positioning member translating means" as a means-plus-function term. Dkts. 49 at 6 &

14  50 at 19. The Court agrees and must first determine the claimed function. *JVW Enters.*,

15  424 F.3d at 1330. USNR contends that the function is set forth in the claim language:

16  "board positioning member translating means for translating said board positioning

17  member in said first direction at said translation speed in cooperative alignment with said

18  board . . . ." '302 Patent, col. 6, ll. 46–49. In plain English, the function is the

19  translation, or movement, of the board positioning members in the first direction at a

20  speed cooperative with the boards on the transfer table. Now that the function has been

21  determined, the Court must identify the corresponding structure for performing that

22  function. *JVW Enters.*, 424 F.3d at 1330.

1    The specification provides a general description of this device and a specific

2  structure in the preferred embodiment.  First, the specification provides as follows:

3         The board positioning member translating means is a flexible
     rotatable member, such as a chain or belt, rotating in a generally vertical
4         plane . . . .
          The flexible rotatable member rotates in the vertical plane so as to
5    translate the board, in a first direction, positioning member substantially in
     the horizontal plane when cooperatively aligned with the board, at the
6         translation speed . . . .

7  '302 Patent, col. 3, ll. 8–18.  Second, the specific embodiment of this element is

8  described as follows:

9         The board positioners 28 are mounted on a set of positioned chains
     (or belts) 42 that are, at one end, mounted on, and driven by, positioner
10        drive sprockets 44 on positioned drive shaft 46, and at their other end,
     mounted on a pair of positioner idler sprockets 48 on a positioner idler shaft
11        50.

12  '302 Patent, col. 4, ll. 55–59.

13        Based on these disclosures, USNR proposes that the Court construe the term

14  "board positioning member translating means" as "a flexible rotatable member such as

15  the chain shown in reference numeral 42, or a belt, for moving one or more board

16  positioning members in the first direction."  Dkt. 46 at 4–5.  Although this construction

17  recognizes the mounting structure, such as the chain or belt, this construction does not

18  account for the translating limitation or drive structure.  The Federal Circuit has provided

19  as follows:

20        The court must construe the function of a means-plus-function
     limitation to include the limitations contained in the claim language, and
21        only those limitations.  It is improper to narrow the scope of the function
     beyond the claim language.  It is equally improper to broaden the scope of
22        the claimed function *by ignoring clear limitations in the claim language*.

1

2
*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1113 (Fed. Cir. 2002)

3
(citing *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 249 F.3d 1314, 1324 (Fed. Cir.

4
2001)) (emphasis added).  USNR concedes that the function is to translate the positioning

5
member at a specific translation speed in cooperative alignment with the board to be

6
positioned.  Construing this "translating means" to simply be a "flexible rotatable

7
member" such as a chain or a belt would improperly broaden the scope of the claimed

8
function by ignoring the clear limitation that the chain or belt must be driven by some

9
structure.  Therefore, the Court declines to adopt USNR's proposed construction.

10
        Piché contends that the Court should adopt the structure identified in the specific

11
embodiment.  Dkt. 56 at 4–5.  The problem with this construction is that it allows for two

12
different rotating structures, a chain or a belt, and only one drive structure, a sprocket.

13
On this issue, USNR's expert testified that one of ordinary skill in the art would

14
understand that a sprocket would not be the only structure capable of rotating a chain or

15
belt and that a chain or belt could be driven by a pulley, a V sheaves, or a drum.  The

16
Court agrees with that assessment of what one of ordinary skill in the art would

17
understand.  Therefore, the Court construes the term "board positioning member

18
translating means" as

19
        a set of positioned chains (or belts) that are, at one end, mounted on, and
        driven by, positioner drive sprockets (or similar drive structures) on
        positioned drive shaft, and at their other end, mounted on a pair of

20
        positioner idler sprockets (or similar structure) on a positioner idler shaft.

21
'302 Patent, col. 4, ll. 55–59.

22

1   **5.      "Selectively actuable guide member"**

2          Piché and USNR request that the Court construe the term "selectively actuable

3   guide member." Dkt. 56 at 4. Piché proposes that the Court construe this term as a "set

4   of pivoting channels as show in reference numeral 30(a)-30(d)." *Id*. Although this

5   construction obviously imports limitations from the preferred embodiment into the

6   claims, Piché argues that such limitations are necessary because the element is disclosed

7   as "interacting with means-plus-function terms . . . ." Dkt. 49 at 8. Specifically, Piché

8   argues that, because the guide member engaging means claimed in claim two should be

9   construed to engage a channel entrance, the guide members disclosed in claim one should

10  be construed to be the channels of the preferred embodiment. *Id*. at 8–9. This

11  construction violates numerous cannons of claim construction, including the canon of

12  claim differentiation wherein it is presumed "that different words used in different claims

13  result in a difference in meaning and scope for each of the claims." *Clearstream*

14  *Wastewater Systems, Inc. v. Hydro-Action, Inc.*, 206 F.3d 1440, 1446 (Fed. Cir. 2000).

15  Therefore, the Court declines to adopt Piché's proposed construction.

16         USNR proposes that the Court construe the term as "positionable device(s) that

17  moves the board positioning member to the board optimizing position." Dkt. 56 at 4.

18  The Court finds that this construction falls within the scope of the written description.

19  For example, the summary of the invention provides "a plurality of guides" that are

20  "independently selectively positionable to allow . . . independent optimized board

21  positioning of successive boards at high transfer chain speeds." '302 Patent, col. 2, ll.

22  11–16. The specification also provides that board positioners "progressively slide . . . to

1  optimized positions for their corresponding boards" as a "result of the progressive

2  actuation of bi-directional selectively actuable positioning cylinders 32 which move

3  position guides 30 . . . ."  *Id*., col. 5, ll. 14–23.  Therefore, the Court construes the term

4  "selectively actuable guide member" as

5  > positionable device(s) that moves the board positioning member to the
   > board optimizing position.

6

### 6.   "Board positioning member engaging position"

7  Piché and USNR request that the Court construe the term "board positioning

8  member engaging position."  Dkt. 56 at 8.  Claim 2 provides that the board

9
   > is urged in said second direction between a board positioning member
10 > engaging position, wherein said board is urged against said board
   > positioning member when said board positioning member is in a first
11 > contact position, and said optimized board position . . . .

12 '302 Patent, col. 7, ll. 6–10.  Piché proposes that the Court should construe the engaging

13 position to be a "constant point of engagement between the board and the board

14 positioning member as they both move in the first direction at the translation speed."

15 Dkt. 56 at 8.  Piché argues that the engaging position must be interpreted as something

16 different from the "first contact position" otherwise one of the terms would be

17 superfluous.  Dkt. 49 at 9–10.  USNR, however, provides a reasonable explanation for the

18 two terms; "first contact position" refers to the position of the board positioning member

19 and "board positioning member engaging position" refers to the position of the board.

20 Dkt. 55 at 13–15.  The Court agrees with USNR's position on positions.  First, a plain

21 reading of the claim shows that the patentee was referring to translating the board from

22 the initial position of the board to the final position of the board, which is the "optimized

1  board position."  Second, claim two also provides a "means for returning said board

2  positioning member from said board optimizing position to said first contact position . . .

3  ."  '302 Patent, col. 7, l. 31 to col. 8, l. 1.  Therefore, the Court adopts USNR's proposed

4  construction and construes the term "board positioning member engaging position" as the

5      location of the board at which the board first contacts the board positioning
       member.

6

7          **7.      "Guide member engaging means"**

8      Piché and USNR request that the Court construe the term "guide member

9  engaging means", and they agree that the term should be construed as a means-plus-

10  function term.  Dkt. 56 at 11.  The Court agrees and must first determine the claimed

11  function.  *JVW Enters.*, 424 F.3d at 1330.  Claim two provides that the board positioning

12  member must have a "guide member engaging means for slideably coupling, by coupling

13  means, said board positioning member to said selectively actuable guide member" ('302

14  Patent, col. 7, ll. 11–14), the member must be "disengageable from said coupling means"

15  (*id*., ll. 25–30), and the member must be repositioned to "reengage said coupling means"

16  (*id*., col. 8, ll. 3–6).  Although the patent discloses the engaging-disengaging-reengaging

17  functions, Piché argues that the Court should only consider the engaging function.  Dkt.

18  49 at 7.  The Court declines to ignore the other disclosed functions of this member and

19  finds that the identified functions are the board positioning member engaging-

20  disengaging-reengaging the selectively actuable guide member.

21      The second step of construction requires the Court to identify the corresponding

22  structure for performing those functions.  *JVW Enters.*, 424 F.3d at 1330.  If one

1   disregards Piché's identified function analysis, then the parties generally agree on the

2   corresponding structure. *See* Dkt. 56 at 9. Therefore, the Court construes the term

3   "guide member engaging means" as

4   > positioner guide rollers (36), or pins, that couple the board positioning
    > member to the selectively actuable guide member.

5

### 8.      "Means for returning said board positioning member"

6

7   Piché and USNR request that the Court construe the term "means for returning

8   said board positioning member", and they agree that the term should be construed as a

9   means-plus-function term. Dkt. 56 at 12. The Court agrees and must first determine the

10  claimed function. *JVW Enters.*, 424 F.3d at 1330. The parties agree that the identified

11  function is to return the board positioning member from the optimized position to the

12  non-optimized, first contact position. Therefore, the Court adopts this identified function.

13  Next, the Court must identify the corresponding structure for performing that

14  function. *JVW Enters.*, 424 F.3d at 1330. The only disagreement between the parties is

15  whether the guide referenced as numeral 54 must be curved. Dkt. 56 at 12. The

16  invention summary discloses "a return guide that resets the board positioned to its first

17  contact position . . ." ('302 Patent, col. 2, ll. 48–49) and the specific embodiment

18  discloses a "[c]urved positioned return guide . . ." (*id.*, col. 4, l. 63). The Court finds that

19  a person of ordinary skill in the art would understand the broader disclosed structure and

20  there is no need to include the limitation that the guide be curved. Therefore, the Court

21  adopts USNR's proposed construction and construes the term "means for returning said

22  board positioning member" as

1   a guide as shown at reference numeral 54 that resets the board positioning
    member.

2

3   **9.      "Angled guide means"**

    Piché and USNR request that the Court construe the term "angled guide means",

4   and they agree that the term should be construed as a means-plus-function term.  Dkt. 56

5   at 13.  The Court agrees and must first determine the claimed function.  *JVW Enters.*, 424

6   F.3d at 1330.  Both parties agree that the identified function is to return the board

7   positioning member from the optimized position to the non-optimized, first contact

8   position.  Therefore, the Court adopts this identified function.

9   Next, the Court must identify the corresponding structure for performing that

10  function.  *JVW Enters.*, 424 F.3d at 1330.  The only disagreement between the parties is

11  whether the guide referenced as numeral 54 must be curved.  Dkt. 56 at 13.  It's

12  undisputed that "curved" and "angled" have two different meanings.  For example, a

13  curved guide member could be or could not be placed at an angle and a guide member

14  that is placed at an angle could be or could not be curved.  Moreover, because the

15  patentee disclosed a "[c]urved positioned return guide" and a "fixed, angled guide

16  means", he is entitled to the presumption that he used different language to refer to two

17  different structures.  Finding no evidence to the contrary, the Court declines to limit the

18  angled guide to the pictured curved guide.  Therefore, the Court adopts USNR's proposed

19  construction and construes "angled guide means" as

20      a guide that is not parallel to the first direction as shown at reference
        numeral 54 that resets the board positioning member.
21

22  **10.      "Said coupling means in a channel along said channel member for**

1    **slideably engaging therein said guide member engaging means"**

2    USNR requests that the Court correct what it claims is an error in the phrase "said

3    coupling means in a channel along said channel member for slideably engaging therein

4    said guide member engaging means."  Dkt. 50 at 27–28.  USNR requests that the Court

5    change the word "in" to "is" so that the phrase is identical to the disclosure in the

6    summary of the invention.  *Id*. at 28.  The Federal Circuit has held that

7    > A district court can correct a patent only if (1) the correction is not subject
> to reasonable debate based on consideration of the claim language and the
8    > specification and (2) the prosecution history does not suggest a different
> interpretation of the claims.

9    *Novo Industries L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003).

10   In this case, the Court will correct the '302 Patent.  First, neither Piché nor Raptor

11   challenges the requested change.  Second, the Court finds that the requested correction is

12   not subject to reasonable debate and the prosecution history does not suggest a different

13   interpretation.  Therefore, the subject phrase shall be corrected to claim

14   > said coupling means is a channel along said channel member for slideably
> engaging therein said guide member engaging means.
15

16                        **IV. ORDER**

17   Therefore, it is hereby **ORDERED** that the undisputed and disputed terms of the

18   '302 Patent shall be construed as set forth herein.

19   Dated this 18th day of April, 2013.

20

21   _____
     RONALD B. LEIGHTON
22   UNITED STATES DISTRICT JUDGE